Mr. Justice Harlan
delivered the opinion of the Supreme-Court, February 11, 1878:
In this action upon a charter-party, executed March 15,1SG2. between Strong and the United States, for the use of his steamer Ocean Wave, he asks judgment for the amount he expended in repairing her after she had been discharged from the seivice of the Government, and also for per diem compensation, at the rate-fixed in the contract, for the time occupied in taking her from Port Royal, South Carolina, to New York, and in repairing her.
The Court of Claims Avas equally divided upon the question of his right to recover, and his petition was dismissed.
By the terms of the charter-party the G overnment avus entitled to the whole and exclusive use of the steamer during the term she was in its service. To the extent of her capacity, it was the duty of Strong to receive and transport all the “passengers”' and the “ stores, wares, and merchandise ” which the GoATernment might send to her. Her use was not limited to any particular waters, and as it was clearly within the contemplation of the contracting parties that she would be employed in aid of" the military forces then engaged in the war for the maintenance of the Union, sending her to the waters of North Carolina and' there employing her for the transportation of stores and men AAras clearly authorized by the charter-party. Munitions of war-AArere “stores” and soldiers “passengers,” Avithin the meaning of that instrument.
*553 Nor was it an unauthorized use of- the vessel to send her up the Neuse Elver, with other boats, on the expedition ordered in December, 18C2, by General Foster,- of the Federal forces.. Before starting, a 30-pound Parrott gun and its carriage, such as-are used on naval vessels, together with ammunition for the gun, and seventeen artillerymen, with their small-arms, and provisions for the expedition, were put on board. The presence of the artillerymen on the vessel was not inconsistent with the terms of the charter-party. In reference to the gun, it is claimed by Strong that the vessel had not the capacity to bear safely such a heavy piece of artillery, and, consequently, that such a use of her was prohibited by the charter-party. Her captain objected at the time to the gun being placed on her, but his objections were disregarded. It is not stated in the findings whether the gun was placed on the vessel for her protection or for offensive operations against the rebels. But it is found that after she had left the vicinity of the rebel fort, the reduction of which seemed to be the object of the expedition, the gun was used to meet an attach of rebel infantry, who fired from the shore into the vessel. The concussion of the firing “ swept off the bulwarks and netting in the track of the explosion,” and one of the effects was u to start the joiner-work, and to break in some of the panels of the doors, and to take a part of the rail off.” Upon the same occasion she struck an overhanging tree, which took off a part of the wheel-house, and swept off" both of the flag-staffs, and all the awning-stanchions. Proceeding down the river, and when three miles above New Berne, she struck a snag and sank. She was raised and taken to New Berne, and there “ temporarily repaired by the Government.” Casualties such as striking trees and snags and sinking were clearly marine risks, which the owner expressly assumed, and the fact that, during the expedition when they occurred, the vessel was managed by a pilot placed on her by the Government officers, cannot affect the rights of the parties. The captain does not appear to have made any objection to such a pilot, nor is it claimed that the latter was negligent or unskillful in the discharge of his duty. On the contrary, he belonged in the neighborhood and was familiar with the river. In regard to the claim for damages resulting from the firing of the gun, we remark that if such use of the vessel were conceded to be in violation of the charter-party, we should be unable to ascertain from *554 tlie record tbe amount of those damages. How far they were met by the temporary repairs made by the Government upon the return of the vessel from the expedition is not stated. When she reached New York, after having been discharged from service, it is stated in the findings that she was “generally repaired throughout.” What portion of these general repairs was chargeable to the injuries occasioned by the marine risks which the owner assumed, and what portion, if any, was chargeable to the injuries caused by war risks which the Government assumed, cannot be determined from the record.
The only question which remains to be considered is that arising on the asserted liability of the Government for the per diem compensation for the time spent in taking the vessel from Port Royal and in repairing her in New York. The charter-party, it is true, expressly provided that she “was to be delivered to the owner in the port of New York, at the expiration of the charter, in as good condition” as she was at its date, “ordinary wear and tear, damage by the elements, bursting of boilers, breaking of machinery, excepted.” In view of this stipulation, was the Government, under the facts established, relieved from the duty of delivering her in New York % We think it was. By the terms of the charter-party-the owner was bound, at his own expense, to keep the vessel tight, stanch, strong, and sound, and her machinery, boilers, and everything pertaining to her in perfect working order, and to provide her with everything necessary for efficient séa-service. Any time which might be lost by reason of the machinery not being in order was to be deducted from the amount claimed to be due at the expiration of the charter. Now, it appears that on the 4th March, 1863, the vessel was out of order and condemned by the Government inspectors, and for those reasons was discharged at Port Royal from the service of the Government. It does not appear that this condemnation was improper or unjust. It is not pretended that she was at that time fit for efficient sea-service. The agreement of the Government to pay $200 per day for the use of the vessel was upon the condition — whether precedent or concurrent is immaterial — that the o wner would keep her in good order. His neglect of that duty, by reason of which she became unsafe and Avorthless for the purposes for which she had been hired, authorized the Government to abandon the contract and discharge her from its sendee. Its obligation to deliver her at *555 New York was concurrent only Avith bis to keep ber in proper condition, and inasmuch as sbe was out of order and unfit for use, it bad tbe riglit to discharge ber at Port Royal, and was relieved from tbe duty of delivering ber to him at New York. His refusal to execute tbe contract gave tbe Government tbe option to rescind it.
Judgment affirmed.